# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| ALYSSA KARLANA WESLEY-BAGNALL, | No.  60892-8-II |
| Respondent, | |
| v. | |
| PETER KARL BAGNALL, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Alyssa K. Wesley-Bagnall obtained a domestic violence protection order against her father, Peter K. Bagnall.[1]  Peter appeals the superior court's order denying his motion for revision of the protection order, arguing that the superior court's findings were unsupported by the record and that the superior court erred in concluding that his conduct constituted unlawful harassment.  We affirm.

## FACTS

A.    PETITION FOR PROTECTION ORDER

On February 25, 2025, Alyssa filed a petition for a protection order on behalf of herself and her children restraining her father, Peter.  Alyssa filed for a protection order because Peter and his wife, Christina Bagnall, visited Alyssa's property unannounced on multiple occasions.[2]  In her

---

[1] Because the parties share the same last name, we refer to each by their first names where necessary to avoid confusion.  We intend no disrespect.

[2] We acknowledge that there is a parent-child relationship involved; however, we also recognize that there is difference between the parent-child dynamic when the child is under the age of 18 and when the child is an adult.

petition, Alyssa also stated that she wanted a protection order due to past incidents of Peter slapping her butt in July 2024 and a "recent account of sexual assault" in November 2024. Clerk's Papers (CP) at 7.

1.      Alyssa's Declaration

In Alyssa's handwritten declaration, she stated that she filed the petition "due to a sexual assault case" on November 11, 2024. CP at 19. In addition to that incident, Alyssa explained:

> [T]here ha[ve] been several times in my life where [Peter] has sexually gropped [sic] my butt or slapped even when I told him to stop regardless of our surroundings. [T]he most recent was in July 2024 in front of his wife and my aunt . . . and her boyfriend Derek and my own children. After these incidents I had told [Peter] [and] his wife (Christina Bagnall) to please not speak to me and blocked them.

CP at 19 (some capitalization omitted).

Alyssa also stated that on December 21, 2024, she found a note slipped under her door from Peter and Christina. Alyssa subsequently texted Christina's mother "to tell [Peter and Christina] to stay off [her] property." CP at 20. Peter and Christina had also visited her property, walked around her locked gate, knocked on her door, and looked in her car windows on December 14. And on February 22, Peter and Christina "went to [her] home once again" and "left mail dated from 2022." CP at 20. Alyssa stated that Peter and Christina waited for someone to open the gate to enter the complex, and they drove around the complex waiting for Alyssa and checking to see if her car was there. Alyssa stated that "[t]hese incidents ma[d]e [her] feel unsafe in [her] home." CP at 20. And Alyssa stated that Peter's contact caused conflict between Alyssa and her children's father because Peter attempted to make contact with the children through him.

Alyssa attached to her declaration her text messages with Christina's mother. In those messages, Alyssa declined an invitation for Christmas dinner, and on December 22, asked

Christina's mother to "let [Peter] and Chrissy know that if they come on [her] property again and go around [her] gate again [she was] gonna have to call the cops." CP at 23, 94. Alyssa continued, "[I] want nothing to do with them and [I]'d just respectfully ask everyone leave me alone[.] [I] do not owe anyone the right to be around me or my kids[,] family or not." CP at 23.

Alyssa also included a letter from her therapist, which stated that Alyssa "reported assault by [her] father, and [Alyssa's] father continued to harass [Alyssa] after the fact and visited unannounced multiple times to [Alyssa's] apartment." CP at 55. The therapist worked with Alyssa to implement coping skills to work through trauma, and Alyssa "us[ed] emotional regulation tools to process emotions during this time." CP at 55.

2.      Peter's Declaration

In response to Alyssa's petition, Peter submitted a declaration and attached exhibits of his text messages with Alyssa. Based on the text messages, prior to November 8, Alyssa texted Peter about challenges keeping a job while taking care of her children, and then told Peter, "[Y]ou're cut off too bye." CP at 36. Peter responded, "You seem a little off, are you ok" to which Alyssa did not respond. CP at 36. On November 8, Alyssa initiated a text conversation with Peter to ask if he forged her signature. Peter responded that he had not, and Alyssa did not respond. Peter proceeded to text Alyssa three more times that day, texted Alyssa again the next day, and at least two more times the following day.

In his declaration, Peter stated that on November 10, 2024, Alyssa stayed in Peter and Christina's spare bedroom. Peter and Alyssa engaged in text conversations over the next two days.

On November 17, Peter texted Alyssa several times with no response. According to the exhibits attached to Peter's declaration, on November 18, he texted her, "Why did you stop talking

3

to me[?] Are the kids ok?" CP at 46. Alyssa responded, "[Y]eah we're good," and Peter asked why Alyssa was ignoring him. CP at 46. Alyssa sent Peter two photographs of her children and then told Peter that she was "cutting everyone off of [her] life while [she] knock[ed] [her] goals out." CP at 47.

On November 22, Alyssa texted Peter asking why Peter needed her birth certificate, claiming that Peter was committing fraud. Peter responded with a photograph of a request to verify that Alyssa was eligible to remain under his insurance. On November 25, Alyssa sent Peter a text message saying that she was filing a police report. On December 3, Alyssa texted Peter to ask if he faked her death certificate. This was the last text Peter received from Alyssa.

Peter also stated that he and Christina still received Alyssa's mail because she previously lived in their home and she was insured under his medical insurance plan. Peter stated that they brought her mail to her residence because they believed the mail was important.

3. Christina's Declaration

Christina stated that around the end of November 2024, she and Peter "noticed a dramatic change in Alyssa's behavior." CP at 104. In December, she and Peter went to Alyssa's home to give her a Christmas card and Christmas outfits for their grandchildren. Alyssa did not answer the door, so they slid the card under the door.

Christina also stated that the week of February 17, she and Peter received a large manila envelope addressed to Alyssa. Christina and Peter thought the mail may have been related to Alyssa's grandmother's estate or prior child custody proceedings. Christina stated that she and Peter went to Alyssa's apartment, knocked on her door, and left the mail at the door. As Christina and Peter drove away, Alyssa was walking back to her apartment, so Peter rolled down the window

4

to greet her. Alyssa "told [Christina and Peter] not to come and see her," and Christina told her they were just dropping off her mail. CP at 105.

B.    DOMESTIC VIOLENCE PROTECTION ORDER

On March 27, 2025, a superior court commissioner heard arguments on Alyssa's petition for a protection order. During the hearing, Alyssa stated that she "need[ed] the restraining order to protect [her] children and [herself] from the harassment and the emotional abuse that [Peter] and his wife have caused [her] and [her] family." CP at 128. Alyssa clarified that "[she] [was] here not because of the sexual assault allegations." CP at 130. Rather, Alyssa was concerned about harassment because Peter and Christina were "trespass[ing] on [Alyssa's] property," "slid[ing] things under [her] door," and "walk[ing] around [her] gate." CP at 130. Alyssa explained that she "need[ed] this order" because Peter and Christina "violated [her] safety. They violated [her] privacy." CP at 130. The commissioner granted the petition, finding that Alyssa proved unlawful harassment by a family or household member by a preponderance of the evidence. The commissioner provided the following findings:

> The respondent is petitioner's father. She has repeatedly told him [and] his wife to not have contact w[ith] her, but they repeatedly disregard her wishes [and] reach out to her in person [and] by text. They engage in a course of conduct that seriously alarms and harasses petitioner, there is no lawful purpose to their actions [and] they have caused petitioner substantial emotional distress [and] her distress is reasonable. Petitioner believes that her father, respondent, sexually assaulted her [and] finds his repeated touching of her bottom [and] refusal to abide by her directive to not contact her alarming and reasonably causes substantial emotional distress. The Court finds petitioner credible.

CP at 64-65Accordingly, the commissioner entered a domestic violence protection order restraining Peter.

C.     MOTION FOR REVISION

On April 4, 2025, Peter moved for revision of the protection order.

In its order on the motion for revision, the superior court found that "the Commissioner's entry of an Anti-Harassment Protection Order [was] supported by a preponderance of the evidence." CP at 161. The superior court highlighted the commissioner's findings, including that Peter and Christina "repeatedly disregard [Alyssa's] wishes and reach out to her in person and by text." CP at 161. The superior court also recited the commissioner's conclusion that Peter and Christina engage in a course of conduct that seriously alarms and harasses Alyssa with no lawful purpose to their actions, and they have caused Alyssa substantial emotional distress that is reasonable. The superior court concluded:

> Having considered the record de novo, the Court finds that the Commissioner's entry of an Anti-Harassment Protection Order is supported by a preponderance of the evidence. In his declaration, Respondent explains the context of his contacts with Petitioner, that is, that he needed clarification relating to his covering Petitioner on his health insurance and that he went to Petitioner's residence to deliver her mail. However, the entirety of the record supports a finding that Petitioner no longer wanted contact with him and had expressed this to Respondent by different means, including through third parties and telling Respondent that she was calling the police.

> [T]he Commissioner also found that Petitioner claims of unwanted butt slapping or groping were also a sufficient basis for granting the anti-harassment order. It is true that Petitioner testified at the hearing that she was not there because of sexual assault allegations. However, in her declaration of February 27, 2025, she had already acknowledged that the rape kit from the alleged sexual assault was negative but she alleged that Respondent had groped and slapped her butt on numerous occasions, the latest time being in July 202[4] in front of family and her boyfriend. She wrote in her declaration that after this incident she asked Respondent and his wife to not speak to her and claimed that she blocked them. Thus, the alleged butt slapping incidents seem to have been the catalyst that caused her to attempt to cut off contact with her father and his wife.

CP at 161-62. Accordingly, the superior court denied Peter's motion for revision.

6

No. 60892-8-II

Peter appeals.

ANALYSIS

A.     DENIAL OF MOTION TO REVISE

Peter argues that the superior court's findings were unsupported by the record and that the superior court erred in concluding that Alyssa established unlawful harassment justifying restraint. We disagree.

1.     Legal Principles

On a motion to revise, "the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner." *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). "The superior court's decision to accept or revise the commissioner's decision then becomes the decision of the court." *In re Parentage of Hilborn*, 114 Wn. App. 275, 278, 58 P.3d 905 (2002).

On appeal, we review the superior court's decision, not the commissioner's decision. *In re Marriage of Stewart*, 133 Wn. App. 545, 550, 137 P.3d 25 (2006), *review denied*, 160 Wn.2d 1011 (2007). We review a superior court's decision to grant or deny a domestic violence protection order for abuse of discretion. *Rodriguez v. Zavala*, 188 Wn.2d 586, 590, 398 P.3d 1071 (2017). A court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *In re Marriage of Freeman*, 169 Wn.2d 664, 671, 239 P.3d 557 (2010).

We review the superior court's findings of fact for substantial evidence. *In re Domestic Violence Prot. Ord. for Timaeus*, 34 Wn. App. 2d 670, 679, 574 P.3d 127 (2025). Substantial

7

evidence is evidence "sufficient to persuade a fair-minded person of the truth of the matter asserted." *Id.* We do not weigh the credibility of witnesses or the persuasiveness of evidence. *Id.*

To obtain a domestic violence protection order, a petitioner must show by a preponderance of the evidence that domestic violence occurred. *Davis v. Arledge*, 27 Wn. App. 2d 55, 64, 531 P.3d 792 (2023). Domestic violence includes "unlawful harassment . . . of one family or household member by another family or household member." RCW 7.105.010(10)(b). "Unlawful harassment" is:

> [a] knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, harasses, or is detrimental to such person, and that serves no legitimate or lawful purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner.

RCW 7.105.010 (37)(a).

2. Challenged Findings

Peter argues that two of the superior court's findings are unsupported by the record. We disagree.

a. When Alyssa notified Peter to desist contact

Peter first challenges the superior court's finding that the July 2024 incident "seem[s] to have been the catalyst that caused [Alyssa] to attempt to cut off contact with her father and his wife." CP at 162. Specifically, Peter argues that the superior court erred in its determination that Alyssa notified Peter to desist contact at the end of July 2024. Peter asserts that Alyssa's handwritten statement creates an ambiguity because Alyssa drew an arrow and wrote "21st" in the left margin of the line next to the sentence that states "I had told [Peter] and his wife . . . to please not speak to me and blocked them." CP at 19. Peter contends that "[t]he only reasonable reading

8

of . . . Alyssa's declaration in the context of the evidentiary record is that she was referring to December 21, 2024, as the date she conveyed her wish to cease contact." Br. of Appellant at 19.

In her declaration, Alyssa wrote:

> negative, there has been several times in my life where Mr Bagnall has sexually gropped my butt or slapped even when I told him to stop regardless of our surrondings. the most recent was in July 2024 in front of his wife and my Aunt (Allison gauel) and her boyfriend Derek and my own children. After these incidents I had told Mr. Bagnall & his wife (christina Bagnall) to please not speak to me and blocked them. 21st → On December 21st, 2024 while I was meeting with a Detective about these problems, I arrived home to a note slipped under my locked door, Mr Bagnall and his wife (christina Bagnall) had went through my private property gate at my home to do so. Later that week I sent a text to Mrs. Bagnalls mother (image Attached) stating to tell them to stay off my property for a second time. On december 14th at

CP at 19-20.[3]

We disagree with Peter's argument that the handwritten "21st" on Alyssa's declaration refers to the date (December 21, 2024) that Alyssa conveyed her wish to cease contact. Rather, the handwritten "21st" in Alyssa's declaration clarifies that the incident where Peter and his wife, Christina, slipped a note under Alyssa's door happened on December 21st, not the date that Alyssa told Peter and Christina to not contact her.

Alyssa's declaration also explains that there were incidents where Peter "sexually gropped [sic] [Alyssa's] butt or slapped," the most recent occurring in July 2024, and that "[a]fter these incidents," Alyssa told Peter and his wife to not speak to her and blocked them. CP at 19. Alyssa

---

[3] [https://perma.cc/T3QD-7MSG].

also wrote that after the December 21st incident, she told Christina's mother to tell Peter and Christina to stay off Alyssa's property "a second time." CP at 20. Thus, substantial evidence supports the superior court's finding; Peter's challenge fails.

b. Alyssa expressing the desire to have Peter cease contact

Next, Peter argues that the superior court erred in finding that Alyssa expressed her desire to cease contact by telling Peter she was going to contact the police. Here, the superior court found the following: "[T]he entirety of the record supports a finding that [Alyssa] no longer wanted contact with [Peter] and had expressed this to [Peter] by different means, including through third parties and telling [Peter] that she was calling the police." CP at 161-62.

Substantial evidence supports the finding that Alyssa notified Peter that she did not want contact with him, including by stating that she was calling the police. Here, Peter is correct that the only messages with Peter in which Alyssa references police involvement to Peter occurred when Alyssa alleged that Peter committed fraud. However, the record shows that Alyssa told Peter she did not want contact with him multiple times. Earlier in the week before the text referencing the police, Peter texted Alyssa to ask why she was ignoring him, and Alyssa responded that she was "cutting everyone off of [her] life while [she] knocked [her] goals out." CP at 47. Alyssa then texted Peter to tell him she was "filing a report" for Peter using her birth certificate, and later texted him, "[I]f you faked a death certificate I have court next week detectives contacted me." CP at 51. Moreover, on December 22, Alyssa told Christina's mother that she "want[ed] nothing to do with them" and asked Christina's mother to inform Peter and Christina that Alyssa would call the police if they visited her property again. CP at 23. A rational trier of fact could conclude that Alyssa's threats to contact police, paired with her explanation that she was "cutting everyone

10

off" and the previous context of Alyssa telling Peter and Christina to stop contacting her in July, communicated to Peter that she no longer wanted contact with him. Accordingly, there is substantial evidence in the record supporting the challenged finding.

3. Unlawful Harassment

Peter challenges the superior court's determination that Alyssa established unlawful harassment. Peter contends that Alyssa failed to show by a preponderance of the evidence that Peter engaged in a willful, ill-intentioned, or harassing course of conduct. He also argues that the factors set forth in RCW 7.105.010(7)(b)[4] support a finding that he had a legitimate purpose for his contact. And Peter argues that Alyssa's emotional distress was not reasonable. We disagree.

a. Course of conduct

First, Peter challenges the conclusion that his acts amounted to a "course of conduct" justifying restraint.

A "course of conduct" is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose" and includes "any form of communication, contact, or conduct, including the sending of an electronic communication." RCW 7.105.010(7)(a).

---

[4] Peter cites to RCW 7.105.010(6)(a), but his arguments relate to former RCW 7.105.010(6)(b), which is now codified at RCW 7.105.010(7)(b). Because there have been no substantive changes to RCW 7.105.010(6)(b), we cite to the current version of the statute.

Peter also baldly states that the superior court "never even addressed the statutory factors set forth in RCW 7.105.010(6)(A)." Br. of Appellant at 24. Without any argument, we do not consider this challenge. *See* RAP 10.3(a)(6); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290, *review denied*, 136 Wn.2d 1015 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

Here, the superior court highlighted the commissioner's findings in its order, including that Peter and Christina "repeatedly disregard [Alyssa's] wishes and reach[ed] out to her in person and by text." CP at 161. Peter's repeated contact with Alyssa over text and visits to her apartment after Alyssa conveyed a desire to cease contact demonstrates a willful intent. And the repeated contacts through text messages in November and December and continued visits in December and February constitute a course of conduct. The highlighted findings support the conclusion that Peter's conduct amounted to a course of conduct justifying restraint.

### b. Legitimate purpose

Peter also argues that the record supports a legitimate purpose for contact under the statutory factors in RCW 7.105.010(7)(b). When determining whether the course of conduct serves any legitimate or lawful purpose, a court should consider the following factors:

> (i) Any current contact between the parties was initiated by the respondent only or was initiated by both parties;
> (ii) The respondent has been given clear notice that all further contact with the petitioner is unwanted;
> (iii) The respondent's course of conduct appears designed to alarm, annoy, or harass the petitioner;
> (iv) The respondent is acting pursuant to any statutory authority including, but not limited to, acts which are reasonably necessary to:
> (A) Protect property or liberty interests;
> (B) Enforce the law; or
> (C) Meet specific statutory duties or requirements;
> (v) The respondent's course of conduct has the purpose or effect of unreasonably interfering with the petitioner's privacy or the purpose or effect of creating an intimidating, hostile, or offensive living environment for the petitioner; or
> (vi) Contact by the respondent with the petitioner or the petitioner's family has been limited in any manner by any previous court order.

RCW 7.105.010(7)(b).

12

As to the first factor, Peter is correct that the contact in November and early December 2024 included contact initiated by Alyssa. Regarding the second factor, Alyssa asked Peter and Christina to cease contact with her after the July 2024 incident such that Peter had clear notice that Alyssa did not want further contact. As to the third factor, Peter's course of conduct includes three visits to Alyssa's home and several text messages to Alyssa without any response. This evidence supports the conclusion that the conduct appears designed to at least annoy or harass Alyssa. As to the fourth factor, Peter's course of conduct was not pursuant to any statutory authority. Regarding the fifth factor, as Alyssa stated in her declaration, Peter and Christina's visits to her apartment made her feel unsafe at her residence, such that Peter's course of conduct had the effect of creating a hostile living environment for Alyssa. Finally, as Peter notes, no previous court order limited contact by Peter with Alyssa or her family. After reviewing the evidence and these factors, the evidence supports the superior court's conclusion that there was no legitimate or lawful purpose to the course of conduct.

c.      Substantial emotional distress

Finally, Peter argues that Alyssa failed to establish that her emotional distress was reasonable.

As the superior court noted, Alyssa alleged that Peter "had groped and slapped her butt on numerous occasions" and that those incidents "seem to have been the catalyst that caused her to attempt to cut off contact." CP at 162. Even after these alleged incidents and notice to cease contact, Peter continued to contact Alyssa through text messages and visited her home three times after the July 2024 incident. Alyssa also stated that Peter and Christina would walk around her locked gate, look in her car windows, wait for others to open the gate so they could enter, and drive

around the complex to see if Alyssa's car was there. In her declaration, Alyssa stated that these incidents made her feel unsafe in her home. And Alyssa stated that Peter's contact caused conflict between Alyssa and her children's father because Peter attempted to make contact with the children through him.

Moreover, during the hearing before the commissioner, Alyssa stated that she needed the protection order because of the harassment and emotional abuse Peter and Christina caused her. And she stated that Peter and Christina "violated [her] safety. They violated [her] privacy. And [she] fe[lt] . . . that [she] need[ed] this order." CP at 130. Further, Alyssa's therapist stated that Alyssa "reported assault by [her] father, and [her] father continued to harass her after the fact and visited unannounced multiple times" and that the therapist worked with Alyssa on coping skills and emotional regulation skills to process Alyssa's emotions. CP at 55.

Such continued contact via text messages and repeated visits in which Peter would bypass Alyssa's locked gate, drive around her apartment complex, look in her car windows, or knock on her door would cause a reasonable person to feel unsafe and suffer substantial emotional distress, even more so given the context of the alleged incidents. Here, the evidence shows that Peter and Christina's conduct caused Alyssa emotional distress.

Moreover, Peter's reliance on *McKinney v. Booker*, No. 84799-6-I, slip op. at 3 (Wash. Ct. App. Jan. 22, 2024) (unpublished),[5] is misplaced. Contrary to Peter's assertion that the court in *McKinney* held that nineteen "'generally emotionally distressing'" text messages would not cause significant harm to a reasonable person, *McKinney* affirmed the trial court's conclusion that the

---

[5] https://www.courts.wa.gov/opinions/pdf/847996.pdf.

No. 60892-8-II

petitioner failed to establish substantial emotional distress because the petitioner did not establish *subjective* substantial emotional distress as to that petitioner. *Id.* at 2-3 To the contrary here, the evidence shows that Peter's continued contact caused Alyssa emotional distress and that such emotional distress was reasonable.

CONCLUSION

Because the superior court did not abuse its discretion in denying the motion for revision, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Ice, J.

We concur:

Maxa, P.J.

Cruser, J.